**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RITA F. DIMARTINO** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 14-7247** |
| | : | |
| **DE LAGE LANDEN FINANCIAL** | : | |
| **SERVICES, INC.** | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

**Rufe, J.**                                                    **September 19, 2016**

In this contract and wage dispute, the parties have filed cross-motions for summary

judgment on the sole issue remaining in this case:  whether Plaintiff, Rita DiMartino, was

entitled to receive from Defendant De Lage Landen Financial Services, Inc. ("DLL"), a long-

term incentive payment of $182,927.88 in 2013 based on performance in 2012.  Although the

parties agree as to many of the facts, they disagree as to the meaning of the relevant agreements.

## I.      FACTS

The parties have stipulated to the following facts.  Ms. DiMartino became employed with

DLL as its Chief Operating Officer pursuant to a written offer dated August 19, 2002, and served

in that capacity from February 3, 2003 until December 2006.  In July 2007, the parties entered

into a written employment agreement memorializing Ms. DiMartino's promotion to Deputy

Chief Operating Officer (Global) on January 1, 2007, a role she held until June 2010, when Ms.

DiMartino became Chief Innovation Officer.  In all of these roles, Ms. DiMartino reported to

DLL's Chief Executive Officer ("CEO"), Ronald Slaats.

Through 2011, Ms. DiMartino was eligible to receive an annual short-term incentive ("STI")[1] of up to 100% of her base salary, and pursuant to a Long Term Incentive Plan ("LTIP"), up to 35% of her base salary.  In 2011, new European regulations required DLL to make changes to its executive compensation program.  DLL created a new executive remuneration policy (the "ERP") on April 1, 2012, effective as of January 1, 2012.  Ms. DiMartino was notified that "[t]he Long Term Incentive Policy is as of January 2012 integrated in the new incentive plan for Executives and has become an integral part of the [ERP]."[2]  As a result, Ms. DiMartino was eligible for a total incentive of 100% of her base salary, with 64% as a short-term incentive and 36% as a long-term incentive.  Because the potential bonus was reduced, executive salaries increased, and Ms. DiMartino's base salary rose from $412,000 to $508,133, effective January 1, 2012.[3]  To align Plaintiff's compensation with the new program, the parties entered into an amendment to the 2007 agreement.  The amendment ("Amendment No. 1") also took effect as of January 1, 2012, although it was executed in April 2012.[4]

---

[1] The parties' use of hyphenation is inconsistent with regard to the phrases long-term incentive and short-term incentive; where quoting from or using the titles of the documents, the Court retains the hyphenation of the original.

[2] Joint Statement Ex. 4 at 1.

[3] Thirty-six percent of Plaintiff's $508,133 salary equals $182,927.88, the amount now at issue.

[4] As is relevant to this litigation, Amendment No. 1 provided that:

    2.  This Amendment No. 1 is effective retroactively as of January 1, 2012;

                                    . . .

    4.  The Section titled Long Term Incentive Plan in the 2003 Contract is deleted in its entirety and the following language inserted in its place:

    Incentive Pay.  In addition to Base Compensation, the Executive will be eligible for incentive (short term incentive plus long term incentive) of 100% of Base Compensation at target.  The annual pay-out of incentive shall be set each year by the CEO.  Forty percent (40%) of the

Anticipating a change in Plaintiff's role with DLL, the parties then entered into a second amendment to the 2007 agreement, effective October 15, 2012 ("Amendment No. 2"). Amendment No. 2 provided that effective January 1, 2013, Ms. DiMartino would become an internal consultant under the direction of Mr. Slaats. Ms. DiMartino's title became Global Chief Information Officer. Paragraph 5 of Amendment No. 2, which forms the crux of the parties' dispute, provides that "[e]ffective January 1, 2013, [Ms. DiMartino] shall no longer be eligible for any new long term incentive grants or awards."[5]   On March 14, 2013, Dick Hendriks, Senior

---

incentive will be deferred for a period of at least three years. All regulations in the Rabobank Group Remuneration Policy regarding incentive pay-out apply.

Joint Statement Ex. 6. Amendment 1 was executed by Plaintiff and Mr. Slaats; although the copy in the record does not include Mr. Slaats's signature, the Court does not understand there to be any disagreement as to its validity.

[5] Joint Statement Ex. 8. Amendment No. 2, which was executed by Plaintiff and Rob Pierik, Executive Vice President for Human Resources, also stated the following with regard to bonuses:

2. [Ms. DiMartino] and [DLL] agree that [Ms. DiMartino] is being separated from her current position as Global Chief Innovation Officer ("CIO") as of December 31, 2012, and that such event shall constitute a redundancy for the purposes of determining [Ms. DiMartino's] 2012 bonus treatment under [the ERP].

3. Effective, January 1, 2013, Executive shall serve as an internal consultant under the direction of Ronald Slaats, or in his absence, his designee ("New Role"). [Ms. DiMartino's] compensation shall remain unchanged regardless of the New Role's job grade or other attributes, but such position shall no longer be considered "identified staff" for the purposes of the Capital Requirements Directive. Nevertheless, [Ms. DiMartino] shall be entitled to a pro-rata payment of her 2012 target incentive with each payroll payment based on the number of days employed during such period upon the earlier to occur of: (i) the scope and responsibilities of [Ms. DiMartino's] New Role is such that it would constitute an executive position if it were a permanent role (a "Senior Role", e.g., head of information technology for [DLL]), or (ii) [Ms. DiMartino] performs services in the New Role beyond March 31, 2013. It is further understood and agreed that to the extent Executive takes a Senior Role in calendar year 2013, the terms and conditions of such Senior Role shall include, without limitation, that [Ms. DiMartino] shall be entitled to a make whole provision which addresses of [sic] any lost opportunity to realize 100% of [Ms. DiMartino's] target bonus in such Senior Role due to the timing of her assumption of such position.

. . .

8. [Ms. DiMartino] acknowledges and agrees that she will only be eligible to receive LTIP related payments for her 2010 and 2011 LTIP grants while employed by [DLL] and upon her termination, for any reason, she will no longer eligible [sic] to receive any LTIP payments related to these

3

Vice President of Global Compensation & Benefits, sent Ms. DiMartino an email, copied to Mr. Slaats, with the subject "bonus 2012," setting forth a schedule for payments of both short-term and long-term incentive pay-out for performance years 2012 and for the previously-awarded 2011.[6]  On March 15, 2013, DLL paid Ms. DiMartino $124,924.50 in short-term incentive compensation.  On March 27, 2013, Rob Pierik, Executive Vice President for Human Resources, sent Ms. DiMartino a letter, stating that Plaintiff's short-term incentive for performance year 2012 was determined at 49.17% of her base salary, or $249,849.  The letter stated that "[y]ou are informed about the LTI 2010-2012 in a separate letter," and directing questions to Mr. Hendriks.[7]

About this same time, the parties amended the 2007 agreement once more ("Amendment No. 3").  Amendment No. 3, which was effective April 2013, provided that on June 30, 2013, Plaintiff would become a global strategic adviser at DLL, still reporting to Mr. Slaats.[8]   On

---

awards.  Nevertheless, to the extent that:  (i) [DLL] establishes and funds a new retirement contribution benefit for its executive group based in the United States; and (ii) [Ms. DiMartino] is employed by [DLL] in a Senior Role at such time, then [DLL] shall either include [Ms. DiMartino] in such plan to the extent she is eligible under the terms of such plan or provide her with a payment in the amount that would have been contributed to such plan on her behalf is [*sic*] she had been eligible without giving effect to any tax benefits.

[6] Joint Statement Ex. 9.

[7] Joint Statement Ex. 10.

[8] Joint Statement Ex. 11.  Amendment No. 3 provided in relevant part that:

4. Compensation and Benefits.  As compensation for all services rendered by [Ms. DiMartino] during the Employment Term:

. . .

    b.  As additional consideration for entering into this Amendment No. 3, [DLL] shall on or about the first regular payroll date following June 30, 2013, Executive shall be paid, subject to required withholding:  (I) accrued paid time off determined as of December 31, 2012; and (II) a pro-rated bonus for 2013 in the amount of Two Hundred and Fifty Four Thousand Sixty Six Dollars and Fifty Cents ($254,066.50).  Paid time off accrued on and after January 1, 2013 and through the remainder of her

4

September 13, 2013, DLL announced Mr. Slaats's resignation as CEO.   Jan Kusters then

became Ms. DiMartino's supervisor, and he directed her to stop performing any work for DLL

but to remain available in accordance with her agreement.

On November 12, 2013, Mr. Hendriks sent an email to Ms. DiMartino with the subject

"deferral of incentve [*sic*]" stating that "something has gone wrong with deferral of your

incentive 2012 in relationship with the LTIP 2013 grant."[9]   DLL recalculated Ms. DiMartino's

---

Employment Term shall be paid on or about the first regular payroll date following the conclusion of her
Employment Term.

      c.  [Ms. DiMartino] shall no longer be eligible for any long term incentive programs as of the
effective date hereof, but [Ms. DiMartino] shall be eligible to receive any 2011 LTIP awards paid out prior
to December 31, 2014.

5.  [Ms. DiMartino and DLL] agree that [Ms. DiMartino] is being separated from her current position as of
the earlier of (i) June 30, 2013; and (ii) the hiring of a new person to head DLL's Global Information
Technology organization ("Job Change Date"); and that such event shall constitute a redundancy for the
purposes of determining [Ms. DiMartino's] 2012 bonus treatment under [the ERP].

Amendment No. 3 was signed by Ms. DiMartino and Mr. Slaats, the latter on May 1, 2013.

[9] The full text of the email is as follows (capitalization, spelling, and punctuation in original):

Hi Rita,
we found out something has gone wrong with deferral of your incentive 2012 in relationship with
the LTIP 2013 grant
in February 2013 we assumed you would continu to work in the CIO role and now we know you
assumed a new strategic advisory role as of June 2013

what happened is that we added the LTIP 2013-2015 to your STI pay-out 2012 and on the basis of
this total sum calculated your bonus deferral (40%) of the total amount)
since the LTIP was more than 40% of the total incentive all the necessary deferral was covered by
it and we did not need to defer any STI

it seems now that in your contract addendum, it is stated you were/are no longer entitled to an
LTIP 2013 grant
in other words it could not have been included in the basis for the calculation of your bonus
deferral and consequently not enough STI was deferred

a second issue is that the pro rata bonus over January-June 2013 was not partly (40%) deferred,
which was necessary because you still were Identified Staff in this period
we are legally forced to correct this and I want to discuss with you how we can do this
can you please call me back ?

thnxs

2012 bonus to consist of an STI pay-out only, in the amount of $249,849.  This was followed

months later by a letter from Mr. Hendriks to Ms. DiMartino dated May 2, 2014, which stated

DLL's position (which Plaintiff disputes in this litigation) that under Amendment No. 2, Ms.

DiMartino was ineligible for long-term incentive compensation linked to the 2012 performance

year and therefore some of her short-term incentive compensation would need to be deferred.[10]

Ms. DiMartino's employment with DLL ended on July 31, 2014.

## II.    LEGAL STANDARD

A court will award summary judgment on a claim or part of a claim where there is "no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."[11] A fact is "material" if resolving the dispute over the fact "might affect the outcome of the

suit under the governing [substantive] law."[12] A dispute is "genuine" if "the evidence is such that

a reasonable jury could return a verdict for the nonmoving party."[13]

In evaluating a summary judgment motion, a court "must view the facts in the light most

favorable to the non-moving party," and make every reasonable inference in that party's favor.[14]

---

Best regards,

Dick Hendriks
SVP Global Compensation & Benefits

Joint Statement Ex. 12  Mr. Hendriks sent a more formal letter dated May 2, 2014, elaborating on these points.  Joint Statement Ex. 14.

[10] According to Defendant, the long-term incentive program referred to was the Global Long Term Incentive Plan 2012 (the "2012 GLTIP").  The plan document for the 2012 GLTIP states it was effective from January 1, 2012 through December 31, 2014.  Joint Statement Ex. 15.

[11] Fed. R. Civ. P. 56(a).

[12] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[13] *Id.*

[14] *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

Further, a court may not weigh the evidence or make credibility determinations.[15]  Nevertheless, the party opposing summary judgment must support each essential element of the opposition with concrete evidence in the record.[16]  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[17]  This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense."[18]  Therefore, if, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine dispute as to any material fact, summary judgment is appropriate.[19]

The rule is no different where there are cross-motions for summary judgment.[20]  As stated by the Third Circuit, "[c]ross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist."[21]

---

[15] *Boyle v. Cty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998).

[16] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

[17] *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

[18] *Walden v. Saint Gobain Corp.*, 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) (citing *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir. 1976)).

[19] *Wisniewski v. Johns–Manville Corp.*, 812 F.2d 81, 83 (3d Cir. 1987).

[20] *Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008).

[21] *Id.* (internal quotation omitted).

## III.   DISCUSSION

### A.   Breach of Contract Claim

Under Pennsylvania law, which the parties agree governs here, a cause of action for breach of contract requires "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages."[22]  "Issues of contractual interpretation are questions of law."[23]  Contracts are to be interpreted according to the parties' intent, and where "a written contract is clear and unambiguous, the parties' intent is contained in the writing itself."[24]  "Unless otherwise specified, a contract's language shall be given its plain and ordinary meaning."[25]  "To determine whether ambiguity exists in a contract, the court may consider 'the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning.'"[26]  "A court must then 'decide whether there are objective indications that the terms of the contract are subject to differing meanings.'"[27] When an ambiguity exists, "parol evidence is admissible to explain or

---

[22] *Omicron Sys., Inc. v. Weiner*, 860 A.2d 554, 564 (Pa. Super. Ct. 2004) (internal quotation marks and brackets omitted).

[23] *Wert v. Manorcare of Carlisle PA, LLC*, 124 A.3d 1248, 1259 (Pa. 2015).

[24] *Id.* (citing *Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 468 (Pa. 2006); *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (1986)).

[25] *Wert* 124 A.3d at 1259  (citing *TruServ Corp. v. Morgan's Tool & Supply Co.*, 39 A.3d 253, 260 (Pa. 2012)).

[26] *Bohler-Uddeholm Am., Inc. v. Ellwood Grp.*, 247 F.3d 79, 93 (3d Cir. 2001) (quoting *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1011 (3d Cir. 1980)).

[27] *Mericle v. Jackson Nat'l Life Ins. Co.*, No. 15-419, 2016 WL 3476400, at *8 (M.D. Pa. June 27, 2016) (quoting *Krizovensky v. Krizovensky*,  624 A.2d 638, 643 (Pa. Super. Ct. 1993) (internal citations omitted)).

clarify or resolve the ambiguity, irrespective of whether the ambiguity is patent, created by the language of the instrument, or latent, created by extrinsic or collateral circumstances."[28]

 In ruling on the motions for summary judgment, the Court is guided by the following points:

> (1) mere disagreement between the parties over the meaning of a term is insufficient to establish that term as ambiguous: (2) each party's proffered interpretation must be reasonable, in that there must be evidence in the contract to support the interpretation beyond the party's mere claim of ambiguity; and (3) the proffered interpretation cannot contradict the common understanding of the disputed term or phrase when there is another term that the parties could easily have used to convey this contradictory meaning.[29]

 Defendant argues that Paragraph 5 of Amendment No. 2, which provides that "[e]ffective January 1, 2013, [Ms. DiMartino] shall no longer be eligible for any new long term incentive grants or awards" means that Plaintiff waived her eligibility to receive long-term incentive compensation for her performance in 2012.  To support this interpretation, Defendant points to Paragraph 8 of Amendment No. 2, which refers to 2010 and 2011 long-term incentive grants, but is silent as to 2012, and Paragraph 4 of Amendment No. 3, which provides that Ms. DiMartino "shall no longer be eligible for any long term incentive programs as of the effective date hereof [April 2013], but . . . shall be eligible to receive any 2011 LTIP awards paid out prior to December 31, 2014," and which also sets out all of the compensation Plaintiff was due upon the end of her employment on July 31, 2014, without mentioning a long-term incentive grant in 2013 for performance in 2012.  Defendant also argues that Plaintiff was not entitled to any long-term incentive grants unless the Executive Board so directed, and that the Executive Board never

---

[28] *Kripp v. Kripp*, 849 A.2d 1159, 1163 (Pa. 2004).

[29] *Bohler-Uddeholm*, 247 F.3d at 95 (footnote omitted).

awarded Ms. DiMartino a long-term incentive grant in 2013 for performance in 2012. DLL argues that Mr. Hendriks's March 2013 communication was an error that was later corrected.

Plaintiff argues that Paragraph 4 of Amendment No. 1 explicitly provided that she would "be eligible for incentive (short term incentive plus long term incentive) of 100% of Base Compensation at target. The annual pay-out of incentive shall be set each year by the CEO."[30] Plaintiff contends that neither Amendment No. 2 nor Amendment No. 3 explicitly changed the bonus eligibility for 2012. Instead, Amendment No. 2 stated that Plaintiff's separation as CIO would be treated as a redundancy for purposes of determining the 2012 bonus and that effective January 1, 2013, Plaintiff would be entitled to a *pro rata* payment of her 2012 target incentive based on the number of days employed. Similarly, Plaintiff argues that Amendment No. 3 provided that her separation from her then-current position no later than June 30, 2013, would constitute a redundancy for the purposes of determining the 2012 bonus treatment under the ERP, and that she would be paid a prorated 2013 bonus of 50% of her base salary. Plaintiff argues that her interpretation is consistent with Defendant's conduct in providing her with the bonus calculation and the initial payment in March 2013—five months after entering into Amendment No. 2. In addition, Plaintiff contends that Mr. Slaats, as CEO, was a member of the Executive Board and could authorize the bonus, and that only after Mr. Slaats's departure did DLL decide that Plaintiff was not entitled to a long-term incentive payment for 2012 performance.

Everyone involved in this case is a sophisticated business person, and Ms. DiMartino and DLL were represented by separate counsel in connection with the amendments to the

---

[30] Joint Statement Ex. 6.

employment agreement. After careful consideration of the record, the Court concludes that the Plaintiff's interpretation accords with the contractual language as a whole.  Amendment No. 2 concerned the effects of Ms. DiMartino's change of position in 2013, which would affect bonus treatment going forward;  it did not alter Plaintiff's eligibility for a bonus for work performed in 2012.  When the parties intended to refer to the 2012 incentive payments they did so explicitly, for example in Paragraphs 2 and 3 of Amendment No. 2.  In addition, "[a] court always may consider the course of performance as evidence of the intent of the parties," and Plaintiff's interpretation—that  "new" long-term incentives referred to performance year 2013 and beyond—is consistent with the parties' conduct.[31]

"The actual performance of the parties under a contract tends to 'make definite that which was previously unclear.'"[32]  If the language were ambiguous, the parties' course of conduct resolves any ambiguity in Plaintiff's favor.  Ms. DiMartino received detailed information about a 2012 incentive payment with both long-term and short-term components, and received initial payment, in the period between the execution of Amendment No. 2 and Amendment No. 3.  In this regard, it is noteworthy that  Amendment No. 2 and Amendment No. 3 contain similar language concerning the effect of Ms. DiMartino's new positions on her 2012 bonus.  Mr. Hendriks sent the March 14, 2013 email to Ms. DiMartino, copied Mr. Ronald Slaats, and stated that he provided the bonus calculation "[a]t request of Ronald."  It would strain credulity to

---

[31] *In re Old Summit Mfg., LLC*, 523 F.3d 134, 137-38 (3d Cir. 2008) (citation omitted); *see also Langer v. Monarch Life Ins. Co.*, 879 F.2d 75, 81 & n. 8 (3d Cir. 1989) ("[E]ven if the contract was not patently ambiguous, we would consider the parties' course of performance, and in light of that evidence conclude that it is latently ambiguous as to the party to bear the risk of loss if the insurance was not obtained.").

[32] *Tax Matrix Techs., LLC v. Wegmans Food Mkts., Inc.*, 154 F. Supp. 3d 157, 178-79 (E.D. Pa. 2016) (quoting *Greene v. Oliver Realty*, 526 A.2d 1192, 1194 (Pa. Super. Ct. 1987)).

conclude that the parties intended to exclude Ms. DiMartino's eligibility for a 2012 long-term incentive in Amendment No. 2, and yet somehow, even though Ms. DiMartino and Mr. Slaats were informed that she had received the long-term incentive, including detailed calculations of the payment schedule, and she had received initial payment, the parties nevertheless moved forward with Amendment No. 3 without any discussion of the issue.

Certainly, the parties could have made explicit in Amendment No. 3 (and in Amendment No. 2 instead of using the word "new") that there was no 2012 long-term incentive payment. Instead, Defendants failed to raise this issue for nearly eight months after Plaintiff received the bonus calculations, and only did so shortly after the resignation of Mr. Slaats, to whom Plaintiff had reported.  According to Defendant, Mr. Pierik executed Amendment No. 2 on behalf of DLL, yet even though he was Mr. Hendriks's superior,[33] Mr. Hendriks was not aware until November 2013 that Ms. DiMartino was not eligible for a 2012 long-term incentive award under Amendment 2.

It is also notable that Defendant's contention that the Executive Board did not authorize the bonus was not raised in either Mr. Hendriks's November 13, 2013 email or his May 2, 2014 letter, and DLL does not dispute Plaintiff's contention that Mr. Slaats had the authority to grant incentive pay; nor does it offer any explanation of why the CEO requested that Mr. Hendriks send the 2012 bonus calculations (long-term and short-term) to Ms. DiMartino if the bonuses were not authorized.[34]  Nor did Defendant cite this as a reason in its answers to Plaintiff's

---

[33] McManus Dep. at 64, Ex. E to Pl.'s Opp. to Def.'s Mot. Summ. J. [Doc. No. 26-1].

[34] Mr. Hendriks's declaration, submitted as an exhibit to Defendant's motion for summary judgment, states that "[o]nly the DLL Executive Board has the power to grant incentive compensation to executives," but also states that in early 2013 he and a colleague "attempted to calculate Ms. DiMartino's incentive compensation and deferral scheme for the performance year 2012.  At the time, I was not aware of a provision in Ms. DiMartino's employment

interrogatories in this litigation dated March 15, 2015.[35]  Having considered "the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning," the Court concludes that Plaintiff's interpretation must prevail.[36]

### B.    Wage Payment and Collection Law

Pennsylvania's Wage Payment and Collection Law ("WPCL")[37] "provides employees a statutory remedy to recover wages and other benefits that are contractually due to them."[38]  This may include the compensation sought by Plaintiff: "The WPCL defines 'wages' as including 'any other amount' pursuant to an employment contract.  For example, bonuses, commissions, and stock options are 'wages.' Thus, if an employee demonstrates that any 'amount to be paid pursuant to an agreement' 'remain[s] unpaid,' then that employee may be entitled to liquidated damages."[39]  Defendant has not argued any basis for denial of the WPCL claim apart from its

---

agreement that made her ineligible for a long-term incentive award in 2013 for performance year 2012.  As a result I mistakenly included a long-term incentive plan award in the calculation."  Hendriks Decl.  ¶¶ 2-3, Ex. to Def.'s Mot. Summ. J. [Doc. No. 19-3].  Notably, Mr. Hendriks does not explain why he would have calculated a long-term award if none had been authorized.   Although Sean McManus, Vice-President of Human Resources of Defendant in the United States, avers in his declaration that "the Executive Board never approved a grant of long-term incentive compensation to Plaintiff in 2013 based on her performance in 2012," he does not state the basis for his knowledge, and, although he states that Mr. Hendriks had no authority to make a grant, he does not state that Mr. Slaats, as a member of the Executive Board, lacked the authority, which Ms. DiMartino understood him to have. McManus Decl. ¶¶ 23-24, Ex. to Def.'s Mot. Summ. J. [Doc. No. 19-5].

[35] Ex. I to Pl.'s Opp. to Def.'s Mot. Summ. J. [Doc. No. 26-1].

[36] *Bohler–Uddeholm*, 247 F.3d at 93 (quoting *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F. 2d 1001, 1011 (3d Cir. 1980)).

[37] 43 Pa. Stat. and Cons. Stat. § 260.1, *et seq.*

[38] *Braun v. Wal–Mart Stores, Inc.*, 24 A.3d 875, 953 (Pa. Super. Ct. 2011) (quoting *Oberneder v. Link Comp. Corp.*, 696 A.2d 148, 151 (Pa. 1997)).

[39] *Braun*, 24 A.3d at 953-54 (citing 43 Pa. Stat. and Cons. Stat. §§ 260.2a; 210).

arguments on the contract claim.  Because Plaintiff has established that she received the 2012

incentive award, the Court will grant summary judgment on this claim as well.[40]

IV.    CONCLUSION

      Although the parties urge different constructions of the relevant agreements, the

contractual language and the parties' course of conduct compels the conclusion that Plaintiff was

awarded both long-term and short-term incentive payments for the 2012 performance year.

Therefore, the Court will grant Plaintiff's Motion for Summary Judgment and deny Defendant's

Motion.  An order will be entered.

---

[40] *See Riseman v. Advanta Corp.*, 39 F. App'x 761, 765 (3d Cir. 2002) (unpublished) (holding that the WPCL applies to a discretionary bonus that was fully earned prior to the termination of employment; "[t]he mere fact that certain compensation is not payable until a future date is not necessarily fatal to a WPCL claim so long as the employee is deemed to have 'earned' it during his employment.").